**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
DESTINY JOY GUOBADIA,

                              Plaintiff,

        -against-                                          **MEMORANDUM OF**
                                                           **DECISION AND ORDER**
ISOKEN IROWA and UHUMWNAMURE                               12-cv-4042 (ADS)(ARL)
LUCKY IROWA,

                              Defendants.
-------------------------------------------------------X
<u>**APPEARANCES**</u>:

**Greenberg Traurig, LLP**
*Attorneys for the Plaintiff*
200 Park Avenue
New York, NY 10166
        By: William C. Silverman, Esq.
            Daniel E. Clarkson, Esq.
            Julia M. Rogawski, Esq.

**Michael O. Adeyemi, Esq.**
*Attorney for the Defendants*
26 Court Street
Suite 1708
Brooklyn, NY 11242

**SPATT, District Judge.**

        On August 14, 2012, the Plaintiff Destiny Joy Guobadia (the "Plaintiff") commenced this

action against the Defendants Isoken Irowa ("Isoken") and Uhumwnamure Lucky Irowa

("Uhumwnamure")(the "Defendants").  This case arises out of claims by the Plaintiff that she

was lured and transported against by the Defendants from Nigeria to the United States based on

false promises, and forced by the Defendants to work without pay as their domestic servant.

        The Plaintiff raised a number of claims, including (1) unlawful trafficking with respect to

peonage, slavery, involuntary servitude or forced labor in violation of 18 U.S.C. §§ 1584, 1589,

1590, 1595; (2) involuntary servitude in violation of the Thirteenth Amendment to the United

States Constitution; (3) a violation of the Alien Tort Claims Act, 28 U.S.C. § 1350; (4) unpaid federal minimum wages as required by the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 203(d)-(e); (5) fraud; (6) false imprisonment; (7) conversion; (8) assault and battery; (9) intentional infliction of emotional distress; (10) negligent infliction of emotional distress; (11) promissory estoppel; (12) quantum meruit; and (13) unjust enrichment.  The Plaintiff seeks compensatory and punitive damages; prejudgment and postjudgment interest; and reasonable attorneys' fees, together with the costs and disbursements incurred in prosecuting this action.

Following the close of discovery, on November 10, 2014, the Defendants moved pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56 for summary judgment dismissing the complaint.

On December 10, 2014, the Plaintiff filed opposition papers to the motion for summary judgment.  The Plaintiff represented that she will not pursue her claims for violation of 18 U.S.C. § 1584 and the Thirteenth Amendment; the Alien Tort Claims Act; negligent infliction of emotional distress; and quantum meruit.  Therefore, the pending claims are (1) forced labor in violation of 18 U.S.C. §§ 1589, 1590, 1595; (2) unpaid wages in violation of the FLSA; (3) fraud; (4) false imprisonment; (5) conversion; (6) assault and battery; (7) intentional infliction of emotional distress; (8) promissory estoppel; and (9) unjust enrichment.

Jury selection is scheduled for September 8, 2015.

For the reasons set forth, the Defendants' motion for summary judgment is denied.

## I.      BACKGROUND

Unless stated otherwise, the following facts are drawn from the parties' Rule 56.1 Statements and attached exhibits and construed in a light most favorable to the non-moving party, the Plaintiff.  Triable issues of fact are noted.

The Plaintiff was born on May 16, 1976 in Benin City, Edo State, Nigeria.  When the Plaintiff was five years old, her father gave her away to her aunt, Mable Guobadia ("Mable").

The Defendant Isoken Irowa, who was born on August 30, 1963 in Benin City, Nigeria, is Mable's eldest daughter and also resided with the Plaintiff in Mable's home in Benin City.

The Plaintiff maintains that from the time she arrived in Mable's home, she was treated like a servant and stayed home all day performing household chores, which interfered with her education in Nigeria. (Pl. Dep., at 25, 34, 59-60.)  The Plaintiff further maintains that, during this time, Isoken engaged in a pattern of extreme physical abuse of her.

In 1989, Isoken moved to the United States.

After the Plaintiff graduated from high school in Nigeria, she continued to live in Mable's home and worked in her store until 2001.

Thereafter, the Plaintiff traveled to Abuja, Nigeria to assist her cousin, Juliet Guobadia a/k/a Juliet Aibangbee ("Juliet"), who had just given birth.  Juliet is Isoken's sister.

In 2003, the Defendants traveled from the United States to Nigeria.  Isoken requested that the Plaintiff return to Benin City from Abuja to serve as the Defendants' servant during their visit, and the Plaintiff agreed. (Id. at 81.)

The Plaintiff subsequently accompanied the Defendants to Lagos, Nigeria as their servant.  In June 2003, the Plaintiff accompanied them to an international airport in order to collect souvenirs to return to family members in Abuja.  Once at the airport, the Defendants told the Plaintiff that she was going with them to the United States.  The Defendants apparently told the Plaintiff that they were bringing her to the United States as a gift for her hard work in service of the Defendants and that she would be able to "go to school" and work in the United States. (Id. at 104-05, 119-20.)

Upon arrival in the United States in June 2003, the Plaintiff, then twenty seven years old, lived for a year in Roosevelt, New York in a relative's home.

In her deposition, the Plaintiff stated that she performed nearly all the domestic work for the Roosevelt household, including cooking, cleaning, and childcare, without pay. (Id. at 145-55.)  The Defendants would return to the Roosevelt home to eat meals prepared by the Plaintiff. (Id. at 138, 159-169.)

Near the end of 2004, Isoken directed the Plaintiff to move to their new home in Hempstead, New York. (Id. at 142-45, 164-65.)  The Plaintiff stated in her deposition that she felt she could not decline to move to Hempstead. (Id. at 164-65.)

At the new home, the Plaintiff performed almost all the domestic duties for the household without pay, which occupied most of her waking hours. (Id. at 174-75, 183, 201-02.)  Further, even after she began to work outside of the Defendants' home, the Plaintiff performed most of the same household chores. (Id. at 308-12.)

The Plaintiff claims that throughout her time working for the Defendants, they prevented her from attending school while promising that she would be able to do so at a future date. (Id. at 202-03, 355-59.)  The Plaintiff maintains that the Defendants isolated her, forbidding her from talking to anybody outside their home.

The Plaintiff claims that if she indicated that she would deviate from Isoken's commands in any way, Isoken would physical strike her.  On at least one occasion, these blows resulted in visible bruises to the Plaintiff's face. (Id. at 411-18, 423-24, 426-27, 444-45, 449-51.)  On at least one occasion, Uhumwnamure apparently witnessed this physically abusive behavior on the part of Isoken. (Id. at 432-40.)

In 2006, the Plaintiff began working in a paid position as a Lunch Monitor for the Hempstead Public School District at Franklin Elementary School.  This position was arranged for her by Isoken.  The Plaintiff worked in this position under the name Juliet Guobadia.

From approximately 2006 until 2010, the Plaintiff also worked for Loving Home Care, a company that provides home health aide services.  This position was arranged for her by Uhumwnamure. (Id. at 281-82.)  At Loving Home Care, the Plaintiff worked under the name Juliet G. Aibangbee.

At Isoken's instruction, the Plaintiff provided her Franklin Elementary School and Loving Home Care wages directly to Isoken, who deposited the checks into her own account. (Id. at 277-79, 285-89, 372.).  The Plaintiff stated in her deposition that Isoken told her that she was depositing the Plaintiff's paychecks into her account for the Plaintiff's own benefit. (Id. at 276-77, 288-89.)

Aside from a small monthly allowance of approximately $100, the Plaintiff was never given the money that she earned in these positions.  At times, this allowance was $50 per month or a Metrocard without cash. (Id. at 278-79, 318-23.)  The Defendants apparently used the Plaintiff's wages to pay their own expenses, including several debit card purchases at a furniture store and at Home Depot. (Pl Exhs. 10, 11.)

The Defendants filed taxes through a company named Sinco Data Processing Systems ("Sinco") in Uniondale, New York.

In total, the Plaintiff earned approximately $35,663 for her work at the Franklin Elementary School and approximately $44,789 for her work at Loving Home Care.  These figures are evidenced by, among other items, payroll records, W2 Statements, and tax returns

that the Defendants filed through Sinco in the name Juliet Guobadia-Aibangbee.  As noted above, the Plaintiff worked in these positions under versions of that name.

Federal and state tax refunds totaling over $19,000 were also issued for the Plaintiff's work.  The Plaintiff maintains that the Defendants misappropriated the tax refunds issued to her from 2009 through 2011.

For example, in April 2009, Uhumwnamur deposited a federal tax refund check for $3,937 issued to the Plaintiff under the name Julie Guobadia-Aibangbee into a bank account under the Defendants' control.  Two days later, Uhumwnamur withdrew $3,937 from this account and deposited it into an account under the name of his company, Aisato, Inc. (Pl Exhs. 6, 7.)

During the time the Plaintiff resided in the Defendants' home, she never had any bank account in her own name or under her control, nor did she have access to the bank accounts controlled by the Defendants. (Id. at 277-78, 288-89, 373.)  The Plaintiff never signed or endorsed her own paychecks. (Id. at 278.)

On or about August 19, 2011, the Plaintiff permanently left the Defendants' home with the help of a co-worker. (Id. at 442-48.)  She claims that she did not leave their home sooner because she did not know anybody else in the United States other than friends and family of the Defendants; she had no knowledge of her legal rights in the United States; and she feared for her safety should she have fled.

According to the Plaintiff, her departure from the Defendants' home was immediately precipitated by her overhearing a conversation between the Defendants about sending her back to Nigeria. (Id. at 446-49.)

The Plaintiff submits an expert report of Dr. Jose Hidalgo, who states his belief that the pattern of abuse perpetrated by the Defendants caused the Plaintiff to perceive that she had no other option but to remain in the coercive situation controlled by the Defendants.

The Plaintiff contends that she continues to suffer from severe emotional distress and other symptoms stemming from the physical, psychological, and verbal abuse that she was subjected to by the Defendants.  The Plaintiff claims she suffers from depression, anxiety, shame, guilt, loss, and grief for which she has received medical and psychological treatment.

## II. DISCUSSION

A. <u>The Legal Standard on a Rule 56 Motion for Summary Judgment</u>

Summary judgment is granted when the "movant shows there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)(quoting Fed. R. Civ. P. 56(c)).  If the movant does this successfully the burden shifts, requiring the opposing party to "offer some hard evidence showing that its version of the events is not wholly fanciful." <u>D'Amico v. City of New York</u>, 132 F.3d 145, 149 (2d Cir. 1998).  Summary judgment is granted only when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." <u>Donnelly v. Greenburgh Cent. Sch. Dist. No. 7</u>, 691 F.3d 134, 141 (2d Cir. 2012)(quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

Once a party moves for summary judgment, the non-movant must come forward with specific facts showing that a genuine issue exists to avoid the motion being granted. West–Fair Elec. Contractors v. Aetna Cas. & Surety Co., 78 F.3d 61, 63 (2d Cir. 1996); see also Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990)(quoting Fed. R. Civ. P. 56(e)).  Typically, a genuine issue of material fact exists only if "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); see Vann v. New York City, 72 F.3d 1040, 1049 (2d Cir. 1995). In addition, mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment. See Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996).

B.  The Defendants' Motion Papers

"[T]he Local Civil Rules require that all briefing be double-spaced." P.G. ex rel. D.G. v. City Sch. Dist. of New York, No. 14 CIV. 1207 (KPF), 2015 WL 787008, at *1 n. 2 (S.D.N.Y. Feb. 25, 2015)(citing Local Civil Rule 11.1(b)).

However, the Defendants' memorandum of law in support of the present motion is single-spaced.  Therefore, the memorandum of law significantly exceeds the 30 pages permitted by the Court's order dated October 25, 2014, which is five pages more than maximum provided for by Section IV(B)(i) of the Court's Individual Rules.

Nevertheless, the Court will consider the entirety of the Defendants' memorandum of law.  However, in the future, the Defendants are advised to comply with the Local Civil Rules governing formatting of filings with the Court.

C.  The Plaintiff's Reliance on Dr. Hidalgo's Expert Report

In opposition to the Defendants' motion for summary judgment, the Plaintiff relies in part on the expert report of Dr. Jose Hidalgo.  Dr. Hidalgo is listed as an expert witness in the joint

pretrial order, which was approved on September 22, 2014 by United States Magistrate Judge

Arlene R. Lindsay.  However, in her opposition papers, the Plaintiff did not attach the expert

report or a sworn affidavit from Dr. Hidalgo.

Therefore, for purposes of the present motion, the Court declines to consider references

to the report.

D. <u>The Claim for Forced Labor In Violation of 18 U.S.C. §§ 1589, 1590, 1595</u>

The Trafficking Victims Protection Act (the "TVPRA") was enacted in 2000, and the

amendment creating its civil cause of action (part of the TVPRA), codified at 18 U.S.C. § 1595,

was enacted only in December of 2003 and amended in December of 2008. <u>Velez v. Sanchez</u>,

693 F.3d 308, 324 (2d Cir. 2012)(citing Pub. L. No. 108–193, § 4(a)(4), 117 Stat. at 2877; Pub.L.

No. 110–457, § 221, 122 Stat. 5044, 5067 (2008)); <u>see also</u> <u>Aguirre v. Best Care Agency, Inc.</u>,

961 F. Supp. 2d 427, 443 (E.D.N.Y. 2013)

Civil liability for forced labor under 18 U.S.C. § 1589 requires a finding, by a

preponderance of the evidence, that the defendant "knowingly provide[d] or obtain[ed] the labor

or service of a person" through one of the following prohibited means:

(1) by means of force, threats of force, physical restraint, or threats of physical
restraint to that person or another person;

(2) by means of serious harm or threats of serious harm to that person or another
person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to
believe that, if that person did not perform such labor or services, that person
or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a); <u>see also</u> <u>United States v. Sabhnani</u>, 599 F.3d 215, 241–44 (2d Cir. 2010);

<u>Shukla v. Sharma</u>, No. 07–CV–2972 (CBA)(CLP), 2012 WL 481796, at *2 (E.D.N.Y. Feb. 14,

2012), <u>appeal dismissed</u> (2d Cir. June 1, 2012).

"Serious harm" includes "threats of any consequences, whether physical or non-physical,

that are sufficient under all of the surrounding circumstances to compel or coerce a reasonable

person in the same situation to provide or to continue providing labor or services." <u>Shukla</u>, 2012

WL 481796, at *2 (quoting <u>United States v. Bradley</u>, 390 F.3d 145, 151 (1st Cir. 2004), <u>vacated</u>

<u>on sentencing grounds</u>, 545 U.S. 1101, 125 S. Ct. 2543, 162 L. Ed. 2d 271 (2005)); <u>see also</u> 18

U.S.C. § 1589, as amended by Pub. L. 110–457, Title II, § 222(b)(3), Dec. 23, 2008, 122 Stat.

5068 (codifying existing case law).

"Abuse of the law or legal process" is the "use of threats of legal action, whether

administrative, civil, or criminal, in any manner or for any purpose for which the law was not

designed in order to coerce someone into working against that person's will." <u>Shukla</u>, 2012 WL

481796, at *2 (citing <u>United States v. Garcia</u>, No. 02–CR–110S–01, 2003 WL 22956917, at *4–5

(W.D.N.Y. Dec. 2, 2003)); <u>see also</u> 18 U.S.C. § 1589, as amended by Pub. L. 110–457, Title II, §

222(b)(3), Dec. 23, 2008, 122 Stat. 5068 (codifying existing case law).

A scheme, plan or pattern violates Section 1589 where it is intended to cause a person to

believe that, if she did not perform such labor or services, she or another individual would suffer

serious harm. <u>See</u> <u>United States v. Calimlim</u>, 538 F.3d 706, 713 (7th Cir. 2008)("The evidence

showed that [the defendants] intentionally manipulated the situation so that [the individual]

would feel compelled to remain. . . . Their vague warnings that someone might report [her] and

their false statements that they were the only ones who lawfully could employ her could

reasonably be viewed as a scheme to make her believe that she or her family would be harmed if

10

she tried to leave."); Nunag–Tanedo v. E. Baton Rouge Parish Sch. Bd., 790 F. Supp. 2d 1134,

1144–46 (C.D. Cal. 2011)(holding that the plaintiffs sufficiently alleged a § 1589 claim where

plaintiffs alleged that defendants "intentionally manipulated the situation so that [p]laintiffs

would feel compelled to remain and would obey all of [d]efendants' demands").

Further, "[t]he TVPRA also provides for liability of any person who 'knowingly recruits,

harbors, transports, provides, or obtains by any means, any person for labor or services in

violation of this chapter.'" Franco v. Diaz, 53 F. Supp. 3d 235, 247 (quoting 18 U.S.C. §

1590(a)).

The Second Circuit has held that "the civil cause of action [of the TVPRA] does not

apply retroactively" to conduct occurring before December 19, 2003. Velez, 693 F.3d at 325; see

also Ditullio v. Boehm, 662 F.3d 1091, 1100 (9th Cir. 2011)("[S]ection 1595 cannot apply

retroactively to conduct that occurred before its effective date."); Nattah v. Bush, 770 F. Supp.

2d 193, 205 (D.D. C. 2011)(holding that the plaintiff could not maintain a claim under § 1595

because § 1595 was not enacted until after the alleged acts at issue).

Therefore, the Plaintiff, who concedes that that she was physically transported to the

United States on or about June 9, 2003, cannot recover on her TVPRA claims for any alleged

conduct that occurred prior to December 19, 2003. See Ditullio, 662 F.3d at 1101–02 (holding

that the plaintiff could not recover for all of defendant's alleged conduct because § 1595 does not

apply to pre-December 19, 2003 conduct, and remanding the case to the district court to

determine whether defendant engaged in conduct that violated the TVPA after December 19,

2003); Shukla, 2012 WL 481796, at *2 n. 1 ("Defendants could not be held liable for any

conduct prior to the enactment of the Trafficking Victims Protection Reauthorization Act in late

2003, which added a civil cause of action.  The jury was instructed as such.  As the jury was also

11

instructed, however, the evidence can be considered as background and context for the alleged post-amendment conduct."); <u>Doe v. Siddig</u>, 810 F. Supp. 2d 127, 136 (D.D.C. 2011)(denying the defendants' motion to dismiss plaintiff's "claims for forced labor and trafficking for purposes of forced labor except insofar as those claims are predicated on acts predating December 19, 2003," and holding that plaintiff "may pursue such claims insofar as they relate to conduct occurring between December 19, 2003" and the date the plaintiff left the defendants' control).

However, the vast majority of the illegal conduct alleged by the Plaintiff occurred after December 19, 2003. <u>Compare</u> <u>Velez</u>, 693 F.3d at 324 ("Velez left Sanchez's home in November 2003, and thus all of the alleged trafficking and forced labor took place before the civil cause of action under the TVPRA was enacted."); <u>Aguirre</u>, 961 F. Supp. 2d at 447 n.14 ("Plaintiff cannot recover for Defendants' actions relating to her initial recruitment and H-1B immigration sponsorship since those actions took place prior to December 2003.  However, Plaintiff is not barred from recovering for any unlawful conduct engaged in by Defendants as of December 19, 2003[.]").

Turning to the merits of the Plaintiff's forced labor claims, the Court finds that there are genuine issues of material fact precluding summary judgment in favor of the Defendants.

As noted above, the Plaintiff testified that she was subjected to repeated physical, verbal, and emotional abuse by the Defendants.  According to the Plaintiff, on at least one occasion, Irowa's physical blows resulted in visible bruises to the Plaintiff's face.  The Plaintiff testified that, in May 2011, Isoken dragged the Plaintiff on a staircase.  In the Court's view, these instances and some of the other instances in the record, if true, could rise to the level of "serious harm" under Section 1589.

Further, the Defendants allegedly threatened the Plaintiff with violence, which, if true, may violate Section 1589's prohibition against "threats of serious harm."

Contrary to the Defendants' contention, the fact that the Plaintiff may have been able to come and go as she pleased from the home does not mean the Defendants' were not engaging her in unlawful forced labor.  Similarly, the Defendants attempt to undermine the Plaintiff's claim that she spent all her waking hours occupied in domestic tasks for them by noting that she sometimes went to church and the mall with the Defendants.  The Defendants further note that at no point did the Plaintiff file a report with the police or authorities.

However, even if this is true, the evidence must be considered under the totality of the circumstances. See 18 U.S.C. § 1589(c)(2)("The term 'serious harm' means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, *under all the surrounding circumstances*, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.")(emphasis added).

In this regard, to the extent the Defendants may have warned the Plaintiff that she would be arrested and deported if she spoke to people outside the home, the Court notes that "[t]he threat of being forced to leave the United States can constitute serious harm to an immigrant within the meaning [§ 1589]." United States v. Rivera, No. 09-CR-619, 2012 WL 2339318, at *5 (E.D.N.Y. June 19, 2012); see also Aguirre, 961 F. Supp. 2d at 444 (stating that "[t]he threat of deportation alone may support a claim for forced labor" under § 1589); Nunag–Tanedo, 790 F. Supp. 2d at 1146 (holding that the threat of deportation constitutes "abuse of legal process" within the meaning of Section 1589 since the objective is to intimidate or coerce the victim into forced labor).

In this case, the Court finds that there is a sufficient dispute of material fact to permit a jury to determine whether the Plaintiff understood that she had an option to leave the home and/or believed that she had to work for the Defendants or she would be deported or subject to various forms of abuse.

In this regard, the factual disputes here resemble those in Elat v. Ngoubene, 993 F. Supp. 2d 497 (D. Md. 2014). In that case, an individual from Cameroon commenced action against her uncle, aunt, and cousins, alleging, *inter alia*, violations of the TVPRA and Maryland common law by forcing her into involuntary domestic labor. The Defendants moved for summary judgment. In denying parts of the motion for summary judgment dismissing the TVPRA claims, the Court found as follows:

> Although the record is replete with evidence that Plaintiff left the Ngoubene home on various occasions and returned, this evidence must be considered under the totality of the circumstances. As discussed, Plaintiff followed the directions of adult authority figures, including her mother, aunt and uncle, and perhaps her cousin Caroline Ngoubene, without question. Therefore, even though she left the Ngoubene home for errands and returned, and even travelled to Cameroon with the Ngoubenes in the summer of 2007 and then returned to their home in the United States, departing Cameroon after the Ngoubenes already had left and bringing her daughter to live with her at the Ngoubene home, there is a sufficient dispute of material fact to permit a jury to determine whether Plaintiff understood that she had any other option.

Id. at 529-30.

The Court further finds that there are genuine issues of material fact as to whether the Defendants violated Section 1590; namely, whether they used threats and coercion to "knowingly . . . harbor[]" and "obtain[]" the Plaintiff for her labor and services.

The Defendants contend that the Plaintiff (1) did not provide any form of domestic service in the home for the Defendants and (2) has not provided evidentiary proof of violence and abuse. (Doc No. 81, at 7-8.). However, these assertions are directly

contradicted by the Plaintiff's deposition testimony.  Further, "[t]he parties' contrasting version of events raises credibility issues that cannot be resolved on a motion for summary judgment.  'Credibility determinations . . . are jury functions, not those of a judge." King v. McIntyre, No. 9:11-CV-1457, 2015 WL 1781256, at *17 (N.D.N.Y. Apr. 8, 2015)(citation omitted); see also Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.").

Interestingly, the Defendants concede that the Plaintiff worked for the Franklin Elementary School and Loving Home Care, yet provide no response to the Plaintiff's contention that she was directed to work under Juliet's name and was not permitted by the Defendants to keep her wages.  Indeed, some of the documentary evidence submitted by the Defendants in support of the present motion, including employment forms with Hempstead Public Schools and Loving Home Care, support the Plaintiff's contention that she was forced to work under Juliet's name. (Defs' Exhs. I, J.)

For these reasons, the Court denies that part of the Defendants' motion for summary judgment seeking to dismiss the forced labor claims.

E. The FLSA Claim

Congress enacted the FLSA in 1938 to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers," 29 U.S.C. § 202(a), and to "guarantee [ ] compensation for all work or employment engaged in by employees covered by the Act." Tennessee Coal, Iron & Railroad Company v. Muscoda Local No. 123, 321 U.S. 590, 602, 64 S. Ct. 698, 88 L. Ed. 949 (1944).

As part of that effort, the FLSA imposes numerous "wage and hour" requirements, including minimum wage requirements, which are at issue in this case.

Only an employer may be held liable for FLSA violations. 29 U.S.C. § 207(a)(1). The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). "The Supreme Court has emphasized that this is an expansive definition with 'striking breadth.'" Olvera v. Bareburger Grp. LLC, No. 14 CIV. 1372 (PAE), ⸻ F. Supp. 3d ⸻, ⸻, 2014 WL 3388649, at *2 (S.D.N.Y. July 10, 2014)(quoting Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 326, 112 S. Ct. 1344, 117 L. Ed. 2d 581 (1992); see also Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999) ("Above and beyond the plain language, moreover, the remedial nature of the statute further warrants an expansive interpretation of its provisions so that they will have 'the widest possible impact in the national economy.'")(quoting Carter v. Dutchess Community College, 735 F.2d 8, 12 (2d Cir. 1984)).

"The question of whether a defendant is an employer under the FLSA is a mixed question of law and fact, with the existence and degree of each relevant factor lending itself to factual determinations." Berrios v. Nicholas Zito Racing Stable, Inc., 849 F. Supp. 2d 372, 393 (E.D.N.Y. 2012). "Therefore, individual employer liability is rarely suitable for summary judgment." Id. (citing Franco v. Ideal Morg. Bankers Ltd., No. 07–CV–3956, 2011 WL 317971, at *6 (E.D.N.Y. Jan. 28, 2011).

In 1974, Congress amended the FLSA to extend the minimum wage protection to domestic workers. Fair Labor Standards Amendments of 1974, Pub. L. No. 93–259, § 7, 88 Stat. 55, 62 (1974). Congress found that "a living wage and respectable working conditions [were] vital" to developing "an effective and dignified domestic workforce" that at the time constituted

2.4 million workers. S. Rep. No. 93–690, at 19–20.  The domestic worker provision governs a worker who in any workweek "is employed in domestic service in one or more households," and who either (1) receives sufficient compensation per calendar year such that his compensation would constitute wages under the Social Security Act or (2) provides the domestic services for more than eight hours per week. 29 U.S.C. § 206(f).

The Department of Labor has promulgated regulations defining the statutory term "domestic service employment" as "services of a household nature," including cooking and babysitting on a more-than-casual basis, for an employer. 29 C.F.R. § 552.3 (2012).

"The line between member of the household and employee becomes especially difficult to discern in the domestic worker context because, as one court stated, the work of a domestic service employee would otherwise be 'carried out in most homes by the family members themselves if the family could not afford to pay outside help.'" Velez, 693 F.3d at 328 (citation omitted).  "However, Congress chose to provide protections for those workers who are not providing that service in the course of purely familial duty, even though it was well aware that difficult distinctions would have to be drawn." Id. (citing legislative history of 1974 Amendments).

In Velez, the Second Circuit outlined the factors relevant to whether a domestic services worker was an employee under the FLSA, namely, (1) the employer's ability to hire and fire the individual, (2) the method of recruitment or solicitation, (3) the employer's ability to control terms of employment such as hours and duration, (4) the presence of employment records, (5) the expectations or promises of compensation, (6) the flow of benefits from the relationship, and (7) the history and nature of the parties' relationship aside from domestic labor.  More important, Velez clarified that an economic realities test is not "confined to a narrow legalistic

definition" but, rather, looks to all circumstances relevant to the matter in issue. Id. at 330 (internal quotation marks omitted).

Here, the Court finds that, based on a totality of the circumstances, genuine issues of material fact exist as to whether the Defendants were an "employer" and the Plaintiff was a domestic servant for them.  For example, as to the first two Velez factors, there are disputed issues over whether the Defendants lured her to accompany them to the United States on false pretenses; dictated where she lived; and could freely fire her.  The fact that the Plaintiff apparently could not live with the Defendants without working for them as a domestic servant weighs in favor of finding an employee-employer relationship. Velez, 693 F.3d at 329 ("A person who must leave the living arrangement when he stops providing services is more likely an employee than someone who can continue to stay in the household without performing those tasks.").

With regard to the third factor, the Court finds that there are genuine issues of material fact over whether the Defendants exerted control over the Plaintiff's hours and wages, including through violence and threats of violence.

As to the fourth factor, there is no indication that there are any employment records for the Plaintiff's work in the Defendants' household.  However, where, as here, the alleged employer-employee relationship is one of a domestic servant, the apparent lack of records is not surprising.   In any event, "[the] Defendant[s'] failure to keep employment records does not defeat Plaintiff's claim of employee status." Campos v. Lemay, No. 05 CIV. 2089(LTS)(FM), 2007 WL 1344344, at *3 (S.D.N.Y. May 7, 2007).

As to the fifth factor, while the Defendants may have promised her that she would be able to enroll in school, it is unclear if they also promised that they would pay for such schooling

As to the sixth factor, the Court finds that there are genuine issues of material fact as to whether the Defendants were the beneficiaries of all of the Plaintiff's housework and childcare and whether she reaped any benefits aside from so-called room and board.

Finally, the history and nature of the parties' relationship weighs in favor of finding an employment relationship.  While the Plaintiff and Isoken are cousins, "family ties to [the Defendants do] not preclude the application of the FLSA." Velez, 693 F.3d at 327.  There is evidence that the Plaintiff was taken from her family when she was five years old and forced to work for Isoken in Nigeria.  There is also evidence that, with no warning and based on false pretenses, the Plaintiff was brought to the United States to continue working for the Defendants.

Weighing these factors, the Court concludes that genuine issues of material fact preclude summary judgment in favor of the Defendants on the contention that no employer-employee relationship existed.  Accordingly, the Court denies that part of the Defendants' motion seeking to dismiss the Plaintiff's FLSA claim.

F. The State Law Claims

Having denied those parts of the Defendants' motion for summary judgment seeking the dismissal of the Plaintiff's federal claims, the Defendants request that this Court decline to exercise supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 is denied. The Court now addresses the merits of these claims in turn.

1. The Fraud Claim

"Common law fraud in New York requires: "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which plaintiff reasonably relied; and (5) which caused

injury to plaintiff." <u>Indus. Tech. Ventures LP v. Pleasant T. Rowland Revocable Trust</u>, No. 08-CV-6227T (MAT), 2015 WL 1924924, at *13 (W.D.N.Y. Apr. 28, 2015)(citation omitted).

In this case, the Court finds that there are genuine issues of material fact with regard to these elements, including whether the Defendants made misrepresentations to the Plaintiff which they knew to be false and which they made with the intent of inducing her reliance.  For instance, there is evidence that Isoken told the Plaintiff that the Defendants were bringing her to the United States as a gift for her hard work and that she would be able to go to school once they arrived in the United States.

There is also evidence that the Plaintiff was never given the opportunity to attend school, but was instead required to work as a domestic servant for the Defendants without pay and to work outside of the home as well.  As noted above, there is also evidence that the Defendants ensured that the Plaintiff's wages from the Hempstead Public School System and Loving Home Care apparently were placed in the Defendants' bank accounts over which the Plaintiff had no control.

On the other hand, a reasonable jury could conclude that the Plaintiff's reliance on these representations may not have been reasonable given the Plaintiff's prior status as a domestic servant for Isoken in Nigeria.  However, the Court does not find that this issue may be resolved as a matter of law.  Indeed, in litigating a common law fraud claim under New York law, a "determination of reasonable reliance [is] often a question of fact." <u>Terra Sec. ASA Konkursbo v. Citigroup, Inc.</u>, 820 F. Supp. 2d 541, 547 (S.D.N.Y. 2011).

Accordingly, the Court denies that part of the Defendants' motion for summary judgment seeking a dismissal the Plaintiff's common law fraud claim.

2.  False Imprisonment

"To prevail on a false imprisonment claim under New York law, a plaintiff must show that '(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" Emanuel v. Griffin, No. 13-CV-1806 (JMF), 2015 WL 1379007, at *11 (S.D.N.Y. Mar. 25, 2015)(quoting Jocks v. Tavernier, 316 F.3d 128, 134–35 (2d Cir. 2003)).

The Court finds that there are genuine issues of material fact with regard to the Plaintiff's false imprisonment claim, thereby precluding summary judgment in favor of the Defendants.  As noted above, there is evidence that the Plaintiff feared physical and emotional reprisals if she permanently left the Defendants' home. See Samirah, 772 F. Supp. 2d at 451 (where jury found "plaintiffs believed that non-compliance with the defendants' directions would result in serious harm," the only reasonable conclusion was "that the plaintiffs were aware of the confinement and did not consent to it").

Again, the fact that the Plaintiff may have been able to venture outside the home for personal visits does not defeat her false imprisonment claim, as a matter of law.

Accordingly, the Court denies that part of the Defendants' motion for summary judgment seeking a dismissal of the Plaintiff's claim of false imprisonment.

3.  Conversion

"Under New York Law, '[c]onversion occurs when a defendant exercises unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession.'" Elsevier Inc. v. Memon, No. 13-CV-0257 (JS)(AKT), 2015 WL 1412745, at *12 (E.D.N.Y. Mar. 23, 2015)(quoting LoPresti v. Terwilliger, 126 F.3d 34, 41 (2d Cir. 1997)).

21

"To maintain a claim for conversion, a plaintiff must show: (1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." Moses v. Martin, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004)(internal quotation marks and citation omitted).

In this case, the Court finds that there are genuine issues of material fact, including as to whether the Defendants (1) directed the Plaintiff to have her checks forwarded directly from Loving Home Care to them; (2) directed the Plaintiff to turn over her paychecks from Franklin Elementary School; and (3) assumed control over her tax refunds.  The Court further finds that there are genuine issues of material fact as to whether the Defendants "converted" specifically identifiable funds, particularly in light of the abovementioned payroll records, W2 statements, and tax returns.

The Defendants' contention that the Plaintiff is fabricating her version of events is essentially a challenge to her credibility, which, of course, is an issue to be decided by the jury.

For these reasons, the Court denies that part of the Defendants' motion for summary judgment seeking to dismiss the Plaintiff's claim of conversion.

4.  <u>Assault and Battery</u>

Under New York law, "[t]o sustain a cause of action to recover damages for assault, there must be proof of physical conduct placing the plaintiff in imminent apprehension of harmful contact." <u>Decter v. Second Nature Therapeutic Program, LLC</u>, 42 F. Supp. 3d 450, 463 (E.D.N.Y. 2014)(citation omitted).  "[B]attery is defined as intentional wrongful physical contact with another person without consent." <u>Franco v. Diaz</u>, 51. F. Supp. 3d 235, 248 (E.D.N.Y. 2014).

The Defendants argue that the Plaintiff's assault and battery claim, first filed on August 14, 2012, is barred by the one-year statute of limitations.  The Plaintiff counters that the applicable statute of limitation should be deemed to have been tolled based on a theory of equitable estoppel, duress tolling, or equitable tolling.

The latter two doctrines apply "as a matter of fairness where a plaintiff has been prevented in some extraordinary way from exercising his rights, we made it clear that we had in mind a situation where a plaintiff could show that it would have been impossible for a reasonably prudent person to learn about his or her cause of action." Pearl v. City of Long Beach, 296 F.3d 76, 85 (2d Cir. 2002); Overall v. Estate of Klotz, 52 F.3d 398, 404 (2d Cir. 1995)(duress tolling); see Mottola v. DeNegre, 518 F. App'x 22, 23 (2d Cir. 2013)(affirming district court order dismissing complaint and finding that the Plaintiff failed to allege facts sufficient to support tolling under New York state law).  "The burden of demonstrating the appropriateness of equitable tolling . . . lies with the plaintiff." Boos v. Runyon, 201 F.3d 178, 185 (2d Cir. 2000); see also Watkins v. Ramos, No. 14 CIV. 2748 (LGS)(SN), 2015 WL 1516673, at *4 (S.D.N.Y. Apr. 3, 2015).

Here, there are genuine issues of material fact with regard to whether the Defendants' alleged coercive and abusive treatment of the Plaintiff caused her to refrain from timely raising a civil assault and battery claim against them.  For this reason, the application of the tolling doctrine in this case is a question appropriately reserved for a jury determination. See Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc., 157 F.3d 933, 943 (2d Cir. 1998)(finding the plaintiff's due diligence in filing to be an issue of fact precluding summary judgment against equitable tolling).

Accordingly, the Court denies that part of the Defendants' motion for summary judgment seeking the dismissal of the Plaintiff's claim of assault and battery.

5.   <u>Intentional Infliction of Emotional Distress</u>

Under New York law, a claim for intentional infliction of emotional distress under New York law requires "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." <u>Green v. City of Mount Vernon</u>, No. 10-CV-707 (KMK), 2015 WL 1455701, at *21 (S.D.N.Y. Mar. 31, 2015)(citations and quotations marks omitted).  "[T]he conduct forming the basis of the claim must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." <u>Id.</u> (citations and quotations marks omitted).

Here, again the Court finds that there are genuine issues of material fact as to each of these elements.  Again, there is evidence that Isoken physically abused the Plaintiff; the Defendants kept her isolated; threatened to have her arrested or deported if she spoke to people outside the home; and that the Plaintiff suffered and continues to suffer severe emotional distress as a result.

Accordingly, the Court denies that part of the Defendants' motion for summary judgment seeking dismissal of the Plaintiff's claim of intentional infliction of emotional distress.

6.   <u>Promissory Estoppel</u>

"Under New York law, promissory estoppel requires '(1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the party to whom the promise is made, and (3) an injury sustained in reliance on the promise.'" <u>Rivero v. INTL FCStone, Inc.</u>, No. 14 CIV.

3879 (PAC), 2015 WL 1290673, at *5 (S.D.N.Y. Mar. 20, 2015)(quoting Sabre Int'l Sec., Ltd. v. Vulcan Capital Mgmt., Inc., 95 A.D.3d 434, 439, 944 N.Y.S.2d 36 (1st Dep't 2012)).

Here, the Court finds that there are genuine issues of material fact as to whether the Defendants induced the Plaintiff to board a plane from Nigeria to the United States based on the promise that she would be allowed to attend school in the United States.

It is true that there may be little evidence of a "clear and unambiguous" promise on the Defendants' part.  However, given the prior relationship between the parties, the Court is of the view that the type of promise alleged here may not have been of a type that would have been reduced to writing or formalized in another way.

Further, the Court finds that there are genuine issues of material fact as to whether (1) Isoken told the Plaintiff that she would open a bank account for her and deposit the Plaintiff's paychecks into that account for the Plaintiff's benefit and (2) the Plaintiff ever received any such money.

Accordingly, the Court denies that part of the Defendants' motion for summary judgment seeking to dismiss the Plaintiff's claim of promissory estoppel.

7.   Unjust Enrichment

"Cases dealing with unjust enrichment in New York are uniform in their recognition of three elements of the claim: 'To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.'" Wurtz v. Rawlings Co., LLC, No. 12-CV-01182 (JFB) (AKT), 2014 WL 4961422, at *10 (E.D.N.Y. Oct. 3, 2014)(quoting Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 586 (2d Cir. 2006) (quoting Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000)).  An unjust enrichment claim "may be asserted

only in the absence of an agreement between the parties – be it oral, written, or implied-in fact." Altaire Pharm., Inc. v. Rose Stone Enters., No. 13–CV–4373 (JFB)(WDW), 2013 WL 6235862, at *7 (E.D.N.Y. Dec. 3, 2013)(citing Beth Israel Med. Ctr., 448 F.3d at 586–87).

Further, under New York law, punitive damages are unavailable for unjust enrichment claims and other quasi-contract claims. See Legurnic v. Ciccone, No. 09–CV1436 (ADS)(AKT), 2014 WL 6674593, at *9–*10 (E.D.N.Y. Nov. 25, 2014).

Here, the Court find that there are genuine issues of material fact as to whether the Defendants benefitted from the Plaintiff's work, including receiving free child-care and household labor, as well as from the Plaintiff's earnings outside the home.  There is also a genuine issue of material fact as to whether the Defendants retained these benefits at the Plaintiff's expense and whether, given the alleged physical and emotional abuse perpetrated against her, equity and good conscience demand that the Defendants not be permitted to retain these benefits.

Again, the Defendants marshal almost no testimony or documentary evidence to refute the Plaintiff's version of events.

Under these circumstances, the Court denies that part of the Defendants' motion for summary judgment seeking to dismiss the Plaintiff's claim of unjust enrichment.

### III.    CONCLUSION

Based on the foregoing reasons, the Defendants' motion for summary judgment is denied.  However, with regard to the Plaintiff's TVPRA claim, the Court finds that she cannot recover based on any of the alleged conduct of the Defendants that occurred prior to December 19, 2003.

**SO ORDERED.**
Dated: Central Islip, New York
May 7, 2015

          ___*Arthur D. Spatt*_____
           ARTHUR D. SPATT
          United States District Judge